UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CARLA BURTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:20-CV-1230 PLC |
| | ) |
| KILOLO KIJAKAZI,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Carla Burton seeks review of the decision of Defendant Acting Social Security Commissioner Kilolo Kijakazi denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act.  For the reasons set forth below, the Court affirms the Commissioner's decision.

**I.      Background**

In November 2017, Plaintiff, who was born in October 1977, filed an application for SSI alleging she was disabled as of December 1, 2016[2] as a result of:  "ACL on left knee torn[], screw in left knee, [high blood pressure, and] swelling in hand had broken in past."  (Tr. 93, 215-20)  The Social Security Administration (SSA) denied Plaintiff's claim, and she filed a timely request for a hearing before an administrative law judge (ALJ).  (Tr. 93-106, 115-17)

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Plaintiff amended the alleged onset date to September 20, 2017.  (Tr. 231)

1

An ALJ conducted a hearing in June 2019. (Tr. 72-92] At the hearing, Plaintiff's counsel announced that Plaintiff intended to apply for DIB and needed to submit additional medical records "to complete the file." (Tr. 75-76) Plaintiff filed an application for DIB in July 2019, and the ALJ conducted a supplemental hearing in January 2020. (Tr. 240-43, 51-70)

In a decision dated February 20, 2020, the ALJ decided that Plaintiff "has not been under a disability, as defined in the Social Security Act, from December 1, 2016, through the date of this decision [.]" (Tr. 29-44) Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council and submitted new evidence, including a letter from Plaintiff's treating physician. (Tr. 212-14) The Appeals Council found that the new evidence did not relate to the period preceding the ALJ's decision and denied review. (Tr. 1-6) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

**II.    Background**

At the first hearing in June 2019, Plaintiff testified that she had an eleventh-grade education, lived with her two teenage children in a third-floor apartment with no elevator, and had previous work experience babysitting her niece's three children. (Tr. 79-81) Plaintiff explained that she had not worked since 2017 because, as a result of her left-knee impairment, she could not sit or stand for long periods of time. (Tr. 82)

Plaintiff stated that she had undergone three surgeries to her left knee and was scheduled to undergo knee replacement later that month. (Tr. 82) Plaintiff explained that her doctors tried to avoid the replacement surgery, "[b]ut as the years went on, it just kept tearing and tearing, it's now getting worser." (Tr. 83) Plaintiff attended the hearing with two crutches, which she stated she used "all the time." (Tr. 84) She also had a cane at home. (Id.) Plaintiff estimated that she

could stand for twenty minutes with either the crutches or the cane and five to ten minutes without any assistive device. (Id.) Plaintiff testified that she could walk less than one block with the crutches or cane. (Id.) In regard to sitting, Plaintiff stated that Dr. Grimshaw directed her to elevate her left leg to prevent pain and swelling, and she estimated that she could only sit ten to fifteen minutes without elevating her leg. (Tr. 85)

When the ALJ asked Plaintiff if she had any other physical impairments, Plaintiff stated, "I'm starting to have it with the other knee, and the whole leg now, because I guess I'm putting too much pressure on it[.]" (Tr. 86) Plaintiff also had asthma and stated that walking and "moving around … trying to get myself prepared for the day" caused her shortness of breath. (Id.) Finally, Plaintiff explained that she recently sought mental health treatment and was diagnosed with PTSD. (Tr. 86-87) Plaintiff described difficulty sleeping and concentrating and stated that she cried "all the time." (Tr. 87)

Plaintiff testified that, on a typical day, "I just sit there and just try to watch TV or just sit in there, sitting with my leg propped up." (Tr. 89) Plaintiff did not leave her third-floor apartment unless she had an appointment and, when she did, she would "scoot[] up and down the stairs." (Tr. 79) Plaintiff explained that she used a desk chair to "wheel around" the house and a shower seat for bathing. (Tr. 79-80) Plaintiff's twenty-six-year-old daughter brought her groceries, and her teenage children did the household chores. (Tr. 88-89)

Prior to the supplemental hearing in January 2020, Plaintiff provided the ALJ additional medical records documenting, among other things, left knee surgeries in June and September 2019. At the start of the supplemental hearing, Plaintiff's counsel asserted that Plaintiff's "issues with her left knee would meet Listing 1.03 with reconstructive surgery of a major weight-bearing joint,

3

with inability to ambulate effectively." (Tr. 53-54) When the ALJ asked Plaintiff whether "anything changed since we were here last," Plaintiff explained:

> Yes, it [is] just starting to get worse. And now it's starting getting more difficult for me, because now, the pain is steady being severe in both my legs. And it's difficult for me to get in and out [of] the tub and stuff now … I have to hold onto things. Like, I done fell twice since I'd had the manipulation in September…. Because I can't bend the way I should, and then I can't lift it the way I should…..

(Tr 58)

Plaintiff appeared at the supplemental hearing with a cane, which she used to elevate her left leg during the proceeding. (Tr. 59) Plaintiff testified that she used a walker "most of the time, because it helps me – when I feel like my leg's stiffening up or lose balance, they gave me the one I can actually sit on, too … which helps a lot when I'm home by myself …." (Tr. 60) Plaintiff explained that she used the cane the day of the hearing because her daughter "has a little car, and the walker, it's hard to get in and out." (Id.) Plaintiff had not "been off an assistive device" for "more than a month" in the past two and a half years. (Tr. 60-61)

Plaintiff testified that she used public "medical" transportation to attend her doctor appointments. (Tr. 63) She could not ride the bus because "then I would have to walk to get to the bus stop, and I wouldn't be able to make it." (Id.) Plaintiff became tearful when she explained: "[I]t's just embarrassing, because I'm using the walker, and then I'm using this cane. I'm only 42 years old, and I need some help. I need somebody to help me." (Tr. 65)

A vocational expert also testified at the hearing. (Tr. 64-68) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work history who could perform work at the sedentary level with the following limitations:

> lift, carry, push, pull ten pounds occasionally, less than ten pounds frequently, sit for six hours, stand and walk for up to two hours in an eight-hour day, occasional ramps and stairs, no ladders, ropes, or scaffolds, occasional stoop,

4

>kneel, crouch, no crawling, no balancing as defined by the DOT, no unprotected heights, no hazardous machinery.

(Tr. 65-66)  The ALJ stated that the hypothetical individual could not perform Plaintiff's past relevant work as a "child monitor," but could perform other jobs that existed in significant numbers in the national economy, such as document preparer, charge account clerk, and food and beverage order clerk.  (Tr. 66)

When the ALJ added that the hypothetical individual would require a cane, the vocational expert testified that she could still perform the jobs previously identified.  (Id.)  However, if the hypothetical individual required the use of a walker, there would not be "competitive employment [available] with the use of a walker, because you would need both hands to operate the walker."  (Tr. 67)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in her statement of uncontroverted material facts, which the Commissioner admits.  [ECF No. 22-1, 25-1]  The Court also adopts the facts contained in the Commissioner's statement of additional facts because Plaintiff does not dispute them.  [ECF No. 25-2]

**III.     Standards for Determining Disability Under the Social Security Act**

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

5

experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. Id. Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.152(c), 416.920(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1. Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that,

6

given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  20 C.F.R §§ 404.1520(g), 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make an adjustment to other work, then she will be found to be disabled.  20 C.F.R. §§ 404.1520(g), 416.920(g).

**IV.    ALJ's Decision**

In her decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920. (Tr. 29-44)  The ALJ determined that Plaintiff:  (1) had not engaged in substantial gainful activity since September 20, 2017, the amended alleged onset date; and (2) had the severe impairments of "status post left knee replacement, degenerative joint disease and osteoarthritis of the knees, obesity, depression, anxiety, and post-traumatic stress disorder." (Tr. 31)  Additionally, Plaintiff had the non-severe impairments of asthma/chronic obstructive pulmonary disease, hypertension, anemia, and gastroesophageal reflux disease.  (Tr. 32)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)  Specifically, the ALJ determined that Plaintiff did not satisfy the criteria for listing 1.02(A), concerning major dysfunction of a joint, because the medical evidence showed neither "an inability to ambulate effectively" nor "insufficient lower extremity functioning to permit independent ambulation without the use of a handheld assistive device that limits the functioning of both upper extremities."  (Id.)

Based on her review of Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these

7

symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"

(Tr. 35)  The ALJ determined that Plaintiff had the RFC to perform sedentary work[3] except:

> she can occasionally lift, carry, push, and pull 10 pounds, and frequently lift, carry, push, and pull less than 10 pounds.  She can sit for 6 hours and stand and walk for 2 hours in an 8-hour workday.  She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  She can occasionally stoop, kneel, and crouch but never crawl or balance as defined by the Dictionary of Occupational Titles.  She cannot tolerate exposure to unprotected heights or hazardous machinery.  She uses a cane for ambulation.  She is limited to routine, repetitive tasks with few changes in the work setting with only occasional interactions with supervisors, coworkers, or the general public.

(Tr. 34)

Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform her past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as addressing clerk and ampoule sealer.  (Tr. 42-43)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 43)

## V.    Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ failed to:  (1) consider "Listing 1.03 or the functional effects of [Plaintiff] needing repeated knee surgeries"; and (2) "include within the RFC the functional consequence of [Plaintiff's] knee impairment[.]"  [ECF No. 22]  In response, the Commissioner asserts that the ALJ properly found,

---

[3] As defined by the regulations,

> sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally….

20 C.F.R. §§ 404.1567(a), 416.967(a).

8

based on the record as a whole, that Plaintiff could perform a range of sedentary work that permitted the use of a single cane.  [ECF No. 25]

### A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome."  Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence."  Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]"  Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

### B. Listing 1.03 (Reconstructive Surgery)

Plaintiff argues that the ALJ erred at step three of the sequential evaluation because she did not consider each element of Listing 1.03, which concerns "reconstructive surgery or surgical arthrodesis of a major weight-bearing joint."  [ECF No. 22 at 3, quoting 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.03]  In particular, Plaintiff claims the ALJ failed to address the significance of Plaintiff's repeated knee surgeries.  The Commissioner counters that the ALJ did not err at step

9

three because she found that "the record did not establish ineffective ambulation, which was needed to satisfy several [musculoskeletal] listings including Listing 1.03." [ECF No. 25 at 5]

"[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) (quoting Sullivan v. Zebley, 493 U.S. 521, 532 (1990)). "That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and he is awarded benefits *without a determination whether he actually can perform his own prior work or other work.*" Lott, 772 F.3d at 549 (emphasis in original) (quoting Sullivan, 493 U.S. at 532). "If the claimant wins at the third step (a listed impairment), [s]he must be held disabled and the case is over." Id. (quoting Jones v. Barnhart, 335 F.3d 697, 699 (8th Cir. 2003)).

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." Igo v. Colvin, 839 F.3d 724, 729 (8th Cir. 2016) (emphasis in original) (quoting Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010)). "An impairment that manifests only some of the [the listing] criteria, no matter how severely, does not qualify." Lott, 772 F.3d at 549 (alteration in original) (quoting McCoy v. Astrue, 648 F.3d 605, 611-12 (8th Cir. 2011)). Moreover, the "severity standards for Listing-level impairments are intentionally high, because 'the listings [for adults] were designed to operate as a presumption of disability that makes further inquiry unnecessary' and ends the sequential process." Moss v. Berryhill, No. 4:18-CV-189 NCC, 2019 WL 1275070, at *3 (E.D. Mo. Mar. 20, 2019) (alteration in original) (quoting Sullivan, 493 U.S. at 532). The claimant bears the burden of proving that an impairment or combination of impairments meets or equals the criteria for a specific listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

10

Listing 1.03 requires a demonstration of "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, *with inability to ambulate effectively*, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03 (emphasis added). An "inability to ambulate effectively"[5] means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities ....

§ 1.00(B)(2)(b)(1). The regulations provide that the SSA "will determine whether an individual can ambulate effectively … based on the medical and other evidence in the case record, generally without developing additional evidence[.]" § 1.00(B)(2)(a).

In her decision, the ALJ did not address Listing 1.03, but rather considered Listing 1.02(A), which concerns the major dysfunction of a weight-bearing joint. 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.02. Under Listing 1.02, "major dysfunction of a joint" is

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with

---

[4] As the parties note in their briefs, the Commissioner revised the musculoskeletal listings effective April 2, 2021, after the date of the ALJ's decision in this case. 85 Fed. Reg. 78164; 20 CFR §§ 404, 416. The ALJ properly cited to the listings in effect at the time. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 967 (8th Cir. 2003).

[5] Examples of ineffective ambulation include:

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

§ 1.00(B)(2)(b)(2). However, "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." Id.

11

>signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  Like Listing 1.03, Listing 1.02(A) requires that the claimant show "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in *inability to ambulate effectively*, as defined in 1.00B2b."  Id. at § 1.02A (emphasis added).

At step three of the sequential analysis, the ALJ found that Plaintiff did not satisfy the criteria for Listing 1.02(A) because "[t]he medical evidence does not show an inability to ambulate effectively." (Tr. 32)  More specifically, the ALJ explained: "The evidence does not show that the claimant has insufficient lower extremity functioning to permit independent ambulation without the use of a handheld assistive device that limits the functioning of both upper extremities." (Id.)

Here, the ALJ did not specifically address Listing 1.03, but she considered Listing 1.02(A) and found that the medical evidence did not show an inability to ambulate effectively.  "Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion, as it does in this case."  Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003); accord Vance v. Berryhill, 860 F.3d 1114, 1118 (8th Cir. 2017). See also Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n. 3 (8th Cir.2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Heintz v. Berryhill, No. 4:16-CV-1894 ACL, 2018 WL 1211172, at *5 (E.D. Mo. Mar. 8, 2018) (ALJ did not reversibly err in failing to consider Listing 1.03 where she found the plaintiff did not satisfy the criteria for Listing 1.02).

Plaintiff claims that the ALJ also erred at step three because, contrary to the ALJ's finding, the record established an inability to ambulate effectively.  In support of her position, Plaintiff points to evidence that she suffered chronic severe knee pain, underwent five surgical procedures between February 2016 and September 2019, and, at various times prior to February 2020, used either two crutches or a walker.  Plaintiff identifies records that support her allegations that she could not ambulate effectively because she needed a two-handed assistive device.  However, "[i]f substantial evidence supports the [ALJ's] decision, then we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we may have reached a different outcome." Moss, 2019 WL 1275070, at *9 (quoting McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010)).

Substantial evidence in the record demonstrated that Plaintiff's use of a two-handed assistive device (walker or two crutches) was intermittent.  As the ALJ noted in her decision, Plaintiff's treating providers documented her use of either crutches or a walker following surgery in October and November 2017, when she was admitted for knee-replacement surgery in June 2019, and after the knee replacement in July 2019.  However, Plaintiff presented to her February 2018 consultative examination without an assistive device and to the January 2020 supplemental hearing with a single cane.  Additionally, numerous medical records in 2017, 2018, and 2019 documented Plaintiff's antalgic gait but no use of an assistive device and, in October 2019, following her fifth surgery, the physician's assistant noted that Plaintiff was walking "much better."  Upon review of the records, the Court finds that the ALJ did not err in determining that Plaintiff did not have an "extreme limitation" resulting in an "inability" to ambulate without the use of a walker or other two-handed assistive device.  See, e.g., Moss, 2019 WL 1275070, at * 7 (substantial evidence demonstrated the plaintiff's use of a walker was intermittent); Gleghorn v.

Colvin, No. 4:14-CV-426 CEJ, 2015 WL 1180358, at *13 (E.D. Mo. Mar. 13, 2015) (the plaintiff did not satisfy the criteria for Listing 1.02(A) where the plaintiff "has, at most, used a single cane to ambulate, and not universally"); Dereschuk v. Colvin, No. 15-CV-86 TNL, 2016 WL 9454329, at * 21 (D. Minn. Mar. 28, 2016), *aff'd* 691 F. App'x 292 (8th Cir. 2017) (the plaintiff's use of a cane "intermittent[ly] and at his discretion" did not satisfy Listing 1.02).

Although Plaintiff's impairments affected her ability to ambulate, there is substantial evidence in the record to conclude that her impairments did not render her incapable of ambulating effectively as described in Listing 1.03. The burden for establishing disability at step three is on Plaintiff, and it is "a particularly high burden." Moss, 2019 WL 1275070, at * 9. See also Heintz, 2018 WL 1211172, at *6; Simmons v. Colvin, No. 4:14-CV-1670 NAB, 2015 WL 7758373, at *3-4 (E.D. Mo. Dec. 2, 2015). Plaintiff did not satisfy the exacting burden to establish that she was unable to ambulate without a walker or other two-handed assistive device.

## C. RFC

Plaintiff claims that the ALJ erred in determining her RFC because the ALJ failed to include "the functional consequence of [Plaintiff's] knee impairment – that she was never capable of standing or walking as much as two hours, and that any standing or walking that was more than minimal required her to use a two-handed assistive device such as crutches or a walker." [ECF No. 22 at 9] Relying on a June 2020 letter from Dr. Grimshaw that she submitted to the Appeals Council, Plaintiff further asserts that the ALJ failed in her duty to develop the record in regard to her need for "more than a cane" for any significant walking.[6] [Id. at 13]

---

[6] In the letter, Dr. Grimshaw wrote: "[Plaintiff] is currently unable to work, crutches are deemed medically necessary." [ECF No. 11] The Appeals Council found that Dr. Grimshaw's letter "does not relate to the period at issue" and therefore "does not affect the decision about whether [Plaintiff was] disabled beginning on or before February 20, 2020." (Tr. 2) Plaintiff neither challenges the

14

The Commissioner counters that the ALJ properly based the RFC determination on all relevant evidence of record, including Plaintiff's testimony and the medical opinion evidence. [ECF No. 25]  The Commissioner further asserts that Dr. Grimshaw's June 2020 letter did not undermine the ALJ's RFC analysis.

RFC is "the most [a claimant] can do despite [his or her] limitations."  20 C.F.R. §§ 404.1545, 416.945.  It is a function-by-function assessment of an individual's ability to do work-related activities on a regular and continuing basis.  SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996).  The ALJ determines a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations."  Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (alteration in original) (quoting Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015)).  "Although it is the ALJ's responsibility to determine the claimant's RFC, the burden is on the claimant to establish his or her RFC."  Buford v. Colvin, 824 F.3d 793, 796 (8th Cir. 2016) (internal citations omitted).

The ALJ thoroughly summarized Plaintiff's medical records, beginning with her first surgery in February 2016, which was left knee arthroscopic-assisted ACL reconstruction and left knee medial and lateral meniscus repairs performed by Dr. Grimshaw.  (Tr. 36)  In March and October 2017, Dr. Grimshaw performed left knee arthroscopic partial medial meniscectomies for medial and lateral meniscus tears.  (Id.)

As detailed in the ALJ's decision, Plaintiff continued presenting to Dr. Grimshaw's office with complaints of chronic, severe knee pain.  Dr. Grimshaw variously prescribed Percocet, muscle relaxants, anti-inflammatory medications, and physical therapy and, in June 2019, he performed a

---

Appeals Council's decision nor asserts that Dr. Grimshaw's letter is new evidence that constitutes a basis for remand.

total left knee replacement.  (Tr. 38)  The following month, Plaintiff's physical therapist noted that she walked without an assistive device at home but used a rollator for longer distances.  (Tr. 849) In August 2019, the physical therapist noted that Plaintiff had made progress with her knee extension range of motion, but little progress in knee flexion passive range of motion (Tr. 844)

Dr. Grimshaw's physician's assistant, PA Shoe, diagnosed Plaintiff with arthrofibrosis, and in September 2019, she performed manipulation under anesthesia left knee with corticosteroid injection, noting in her operative findings an "[a]udible release of scar tissue."  (Tr. 838)  In October 2019, Plaintiff informed PA Shoe "she is walking much better, states there is some slight tightness in the knee but overall feels improved."  (Tr. 856)  On physical examination, PA Shoe noted "well healed incision, she knows full active extension with further flexion to about 100 degrees.  No laxity with varus or valgus testing.  1+ soft tissue swelling, no joint effusion."  (Id.) The following month, Plaintiff again reported that her left knee "was improving although the recent weather change has cause[d] some increased pain," but complained of pain and stiffness in her right knee.  (Tr. 894)  The only assistive device mentioned in Plaintiff's medical record after September 2019 is a Dyna splint.  (Tr. 859)

The ALJ also considered the medical opinion evidence, including the consultative examination performed by Dr. Ishida in February 2018.  (Tr 41)    Dr. Ishida noted that Plaintiff "hobble[d]" when she walked but was not using an assistive device.  Plaintiff reported that she could walk "50-60 feet maybe," "stand 3-4 minutes," and climb and descend stairs "with difficulty."  (Tr. 431)   Dr. Ishida observed that Plaintiff could not cross her left leg over her right leg, could not toe-heel walk, and had difficulty "moving around the room," getting on and off the examination table, and squatting.  (Tr. 432)  Dr. Ishida determined:  "[Plaintiff] has persistent left knee pain after surgery.  Gait is affected and she has difficulty walking long distances."  (Id.)  To

16

the extent Dr. Ishida found Plaintiff had limitations to her hands, the ALJ found his opinion was "not persuasive." (Tr. 41)

The ALJ also considered the RFC assessment completed by Agency physician Dr. Jung, who reviewed Plaintiff's medical records in February 2018.  (Tr. 41)  Based on Plaintiff's treatment notes, MRI results, and consultative examination, Dr. Jung determined that Plaintiff could:  occasionally lift or carry ten pounds; frequently lift or carry less than ten pounds; stand and/or walk for a total of two hours per day; sit with normal breaks for about six hours per day. Tr. 100)  The ALJ found that Dr. Jung's opinions were "persuasive in limiting her to the sedentary exertional level, as the evidence consistently showed ongoing limitations related to her left knee with multiple surgical corrections." (Tr. 41)  However, the ALJ deemed Plaintiff more limited than Dr. Jung, reasoning "the evidence also supports some postural and exertional limitations due to limited range of motion of left knee with pain." (Id.)

The ALJ also discussed Plaintiff's testimony and self-reported limitations.  In her function report, Plaintiff stated that she was able to meet her personal care needs, prepare simple meals, shop with a "riding cart," and use public transportation. (Tr. 286-91)  At the first hearing in June 2019, Plaintiff testified that she lived in a third-floor apartment with no elevator and "scooted" up and down the stairs.  She used a roller chair in the house and a shower chair in the bathtub.  She used either crutches or a cane "all the time," and estimated that she could walk less than one block with an assistive device and "from here to out the door" without an assistive device.  At the January 2020 supplemental hearing, Plaintiff testified that she used a walker "most of the time" but she brought a cane to the hearing because it was more convenient.  She was able to go up and down stairs using a cane and a rail, and walked only "in the house or when I go to the doctor[.]"

In formulating the RFC, the ALJ considered the limitations resulting from Plaintiff's "bilateral knee osteoarthritis and residuals from left knee surgeries, as well as obesity" and "left knee pain, decreased range of motion, and crepitus." (Tr. 41)  The ALJ noted:  "[T]hough the medical evidence did not consistently show the use of an assistive device other than during the surgical recoveries, the claimant's testimony was considered in determining the need for a cane for ambulation."  (Id.)  The ALJ therefore limited Plaintiff to sedentary work, with various exertional and postural limitations.  Specifically, the ALJ found that Plaintiff could "sit for 6 hours and stand and walk for 2 hours in an 8-hour work day," and she included in the RFC the use of a cane for ambulation.  (Tr. 34)

Plaintiff challenges the RFC on the ground that there was no evidence that Plaintiff could ambulate for a total of two hours per day with only a one-handed assistive device, such as a cane.  This question of a one-handed assistive device (cane) versus two-handed assistive device (walker or two crutches) is critical to the outcome of Plaintiff's case because the vocational expert testified that the need for a two-handed assistive device would preclude sedentary work.

The Court finds that substantial evidence on the record as a whole supports the ALJ's RFC determination.  As previously discussed, the record reflected Plaintiff's use of a walker was intermittent and appeared to correlate with her knee surgeries.  Multiple treatment records reflected that Plaintiff's gait was antalgic but did not note the use of an assistive device.  The consulting examiner Dr. Ishida noted that Plaintiff used no assistive device in February 2018, and the ALJ observed that she was using a cane at the supplemental hearing in January 2020.  Moreover, Plaintiff's condition improved after her knee replacement in June 2019 and manipulation in September 2019.  Plaintiff was walking "much better" in October 2019 and, in November 2019, a physician's assistant noted she was negative for a gait problem.  After Plaintiff's fifth surgery in

18

September 2019, the only assistive device mentioned in her medical and therapy records is a Dyna splint. The Court therefore finds that substantial evidence on the record as a whole supports the ALJ's finding that Plaintiff could walk two hours, with the use of a cane, during an eight-hour workday. See, e.g., Heintz, 2018 WL 1211172, at *9-10.

Finally, Plaintiff argues the ALJ erred in failing to further develop the record by seeking clarification from her treating physician that she required the use of "more than a cane." In support, Plaintiff points to Dr. Grimshaw's June 2020 letter, which she submitted to the Appeals Council, stating that Plaintiff "is currently unable to work" and "crutches are deemed medically necessary." (Tr. 11)

An ALJ has a duty to fully and fairly develop the record, and failure to do so is reversible error when the record "does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work." Byes v. Astrue, 687 F.3d 913, 916 (8th Cir. 2012). An ALJ's duty to develop the record arises only if a crucial issue was undeveloped. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "So long as other evidence in the record provides a sufficient basis for their decision, the ALJ does not need [to] seek additional evidence." Johnson v. Saul, No. 4:18-CV-1820 JAR, 2020 WL 1557169, at *4 (E.D. Mo. Apr. 1, 2020) (citing Martise v. Astrue, 641 F.3d 909, 926-27 (8th Cir. 2011)).

Here, the record contained sufficient evidence to support the ALJ's findings as to Plaintiff's functional limitations. Agency physician Dr. Jung found that Plaintiff was able to perform sedentary work with limitations. Additionally, consulting examiner Dr. Ishida's finding that Plaintiff "has difficulty walking long distances," is consistent with the ALJ's RFC assessment limiting to Plaintiff to sedentary work. In fact, the ALJ's RFC limitations went further than the opinions of Drs. Jung and Ishida because the ALJ included the use of a cane for ambulation. In

short, the record contained substantial evidence to support the ALJ's RFC assessment, which properly accounted for her left-knee impairment and need for a cane to ambulate.

## VI.     Conclusion

For the foregoing reasons, the Court finds that the ALJ based her determination on the evidence in the record, including medical records, observations of treating physicians, medical opinions, and Plaintiff's own descriptions of her limitations, as set forth in her function report and hearing testimony.  Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2022